# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

|  |  |  |
|---|---|---|
| **JAMY GILINSKY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 3:20-cv-00261** |
| | ) | **Judge Aleta A. Trauger** |
| **MARCUS & MILLICHAP REAL** | ) | |
| **ESTATE INVESTMENT SERVICES** | ) | |
| **OF SEATTLE, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM</u>

Before the court is the defendant's Motion for Summary Judgment (Doc. No. 16), seeking judgment in its favor on the plaintiff's claims under the Americans with Disabilities Act ("ADA") and Tenn. Code Ann. § 50-1-102. For the reasons set forth herein, the motion will be granted.

## I.   UNDISPUTED FACTS[1]

### A.   M&M's Nashville Office

Defendant Marcus & Millichap Real Estate Investment Services of Seattle, Inc. ("M&M") is a commercial real estate firm with an office in Nashville. Joseph "Jody" McKibben has worked in M&M's Nashville office as Vice President/Regional Manager since January 2017. Currently, he reports to M&M's Executive Vice President, but in 2017 and 2018, he reported to Division Manager Bryn Merrey.

Within McKibben's region, which includes six offices across Tennessee, Alabama,

---

[1] Unless otherwise indicated, the facts set forth herein for which no citation is provided are drawn from the plaintiff's Response to Defendant's Statement of Undisputed Material Facts (Doc. No. 23) and are either undisputed or viewed in the light most favorable to the plaintiff.

Mississippi, Louisiana, Arkansas, and Oklahoma, M&M employs an operations manager to handle day-to-day operations and a marketing coordinator to handle all marketing for McKibben's region and for North and South Carolina. Across these offices, McKibben oversees approximately sixty brokers and/or agents, who are affiliated with M&M as independent contractors rather than as traditional employees. McKibben assists the brokers and agents by reviewing their sales and helping them develop business plans for future projects. At the time of McKibben's deposition, M&M had approximately sixty agents in his region, making up twelve teams. (McKibben Dep. 21.)[2]

Each broker who contracts with M&M has the autonomy to work individually or to build up his or her own team. Agents who want to build their own team can hire junior brokers and their own marketing coordinator, to whom the company also refers as "sales office assistants" (McKibben Dep. 20), to work specifically with that agent's team. However, while the agents can each determine how they want to structure their business, they need McKibben's "blessing" to bring on team members. (McKibben Dep. 21.) McKibben has final say on the brokerage teams' hiring decisions if individuals are brought on as independent contractors. (McKibben Dep. 23.) If someone is hired as an operations manager, broker assistant, or marketing coordinator to serve his entire region, as opposed to a specific brokerage team, McKibben needs approval from his division manager. (McKibben Dep. 24.) In addition, he needs approval from the division manager if an agent wants to bring in an employee, as opposed to a contractor. As McKibben testified, "To hire a broker or somebody who is going to be working on their team [as an independent contractor] in any capacity, that's my decision. . . . If they are going to be an employee of the firm, I'd have to,

---

[2] The plaintiff and the defendant both filed complete transcripts of McKibben's deposition, located in the record at Doc. Nos. 19-16 and 24-2.

you know, go through the process and get that approved." (McKibben Dep. 24, 25.) Further, all M&M employees (as distinct from independent contractors) must pass a background check and complete onboarding with its HR department before they are hired. (McKibben Dep. 51.) McKibben did not recall a situation in which a broker had ever hired a marketing coordinator as a "W-2 employee" who was paid directly by the broker rather than being on "M&M's payroll." (McKibben Dep. 25.)

In 2017, Wes Tiner was one of the agents who worked for M&M within McKibben's region as an independent contractor agent under the title Vice President of Investments. Tiner began working in this capacity in 2013. Tiner was one of the agents who preferred to work with a team during his time as an agent with M&M.

### B. Plaintiff's Background

Plaintiff Jamy Gilinsky considers Medford, Oregon her home. She visited Tennessee for the first time in 2016 and was favorably impressed. Beginning in June 2016, Gilinsky lived periodically with an aunt and uncle who resided in Goodlettsville, Tennessee. She worked off and on for a business operated by her aunt and uncle beginning around July 2017 and continuing until the summer of 2018, when she began working full-time for Meredith Corporation. (Gilinsky Dep. 13, 15.)[3] In 2016 and 2017, because her aunt and uncle's business did not require her physical presence in Nashville, Gilinsky split her time between Medford and Nashville. She worked for her aunt and uncle's business in exchange for room and board and to help them out, while she continued to look for full-time paid employment elsewhere. Gilinsky has years of past experience in sales operations, marketing, and advertising in the real estate field as well as in communications

---

[3] The plaintiff and the defendant both filed complete transcripts of Gilinsky's deposition, located in the record at Doc. Nos. 19-1 and 24-1.

and media.

Gilinsky was diagnosed with melanoma in June 2017. She had surgery at the time to remove four spots on her back, shoulder, and chest. After her surgery, she was referred to an oncologist for blood work and follow-up care, a genetic workup, and "Castle" testing.[4] Her doctors determined that the cancer had not spread to her lymph nodes. As part of her treatment, the plaintiff is required to maintain quarterly checkups with a dermatologist and an oncologist. Since that time, the plaintiff has not had any additional melanomas removed, and her cancer is considered to be in remission. However, she has had twelve surgeries to remove precancerous and basal cells.

The plaintiff's only claimed disability for purposes of this lawsuit is cancer. In its current state of remission, the cancer affects her life because she has to be "very diligent in making sure [she's] seen every three months [by her doctors]," because she has a "genetic disorder where [she] . . . make[s] abnormal moles, so [she and her doctors] have to watch things very closely and make sure that [they're] catching [precancerous and basal cells]" before they turn into melanomas. (Gilinsky Dep. 22–23.)

Following her cancer diagnosis, Gilinsky determined that she liked Nashville and wanted to find full-time work here. She searched Craigslist for jobs in sales, marketing, advertising, and real estate. Sometime in October 2017, she found a job posting on Craigslist for a CRE Brokerage Sales Assistant to help with marketing. She posted her resume in response. Gilinsky does not recall whether the job posting on Craigslist mentioned compensation or for whom the successful applicant would be working.

### C.     Gilinsky's Initial Interactions with M&M

On October 5, 2017, Wes Tiner emailed Gilinsky to let her know that he had received her

---

[4] The parties do not define the term Castle testing. It appears to be a form of genetic testing.

resume and was interested in discussing the job further with her. After some back and forth between them over the next few days, Tiner and Gilinsky had a telephone call around October 11, 2017, for approximately thirty minutes, during which they generally discussed each other's backgrounds and what each was looking for. During this initial telephone call, Gilinsky told Tiner that she had melanoma, was recovering from surgery, and wanted to find full-time employment in Nashville. She remembers Tiner as being "very kind" in his response to her telling him about her cancer diagnosis and as assuring her that the job, if it worked out, would provide health benefits. (Gilinsky Dep. 34–35.)

Toward the end of October, Gilinsky traveled to Nashville to interview with Channel 5 for a position as an Account Executive, Sales and Marketing. She let Tiner know that she was in Nashville and available to meet in person. On October 31, 2017, Gilinsky attended an in-person interview at M&M's offices with Tiner and Bito Mann, another agent who worked with Tiner. The interview lasted an hour to an hour and a half. During the interview, Tiner explained to the plaintiff in greater detail what he did, what he wanted to do in the upcoming year, the areas in which he needed assistance, and how he envisioned Gilinsky helping him. Gilinsky believed that her previous work in a real estate office and her fifteen years of experience in marketing and advertising made her a good fit for the position described by Tiner.

Gilinsky relayed to Tiner and Mann that her "end goal" was to obtain her real estate license. (Gilinsky Dep. 41.) However, she wanted to wait until she was five years past her cancer diagnosis, because she needed health benefits and stability. Tiner and Mann expressed support for her decision to wait until five years after her diagnosis to complete her coursework and obtain her real estate license. Gilinsky disclosed to them everything she had gone through with her cancer diagnosis and surgery and the fact that she would need flexibility in her work schedule in order to

attend quarterly doctors' appointments and undergo possible future surgeries. She emphasized that she absolutely had to have benefits as part of any employment and would not leave Oregon unless she had health benefits. Tiner and Mann "made it sound like they were" supportive of this concern. (Gilinsky Dep. 42.) Tiner and Mann believed that the plaintiff would "make a good asset" and were interested in following up. (Gilinsky Dep. 43.) Although exact numbers were not discussed, Tiner and Mann relayed that compensation for the position would consist of "base with commission." (Gilinsky Dep. 43.)

Later on the same day, October 31, 2017, Gilinsky e-mailed Tiner and Mann to thank them for their time and to express how appreciative she was "of [their] understanding with [her] current situation" (Doc. No. 19-5), by which she meant their understanding of her need for flexibility to attend doctors' appointments and potential time off for future surgeries (Gilinsky Dep. 58–59). Gilinsky also raised some additional questions about Tiner's goals for 2018 and the position, including the likely pay range and benefits. (Doc. No. 19-5.)

Tiner responded to the plaintiff's questions in a response email on November 14, 2017. He estimated that the base salary would "probably" be in the "$40k range," with a bonus or commission on each sale and "a cap in the $75–$80K range." (Doc. No. 19-5.) Around the same time frame, Tiner called Gilinsky and verbally offered her the job. The job title would be brokerage sales assistant, and, according to Gilinsky, Tiner confirmed that the salary would be in the range of $40,000 to $50,000 base, with "a commission on every sale," capping out at around $85,000 the first year. (Gilinsky Dep. 44.) Tiner stated that she would be an employee of M&M and entitled to "health benefits, 401(k), all the traditional benefits that employees get." (Gilinsky Dep. 45.) She accepted the job during that telephone call. At the conclusion of the call, Tiner indicated that he would "send over . . . information on benefits and. . . a start date." (Gilinsky Dep. 47.)

On November 20, 2017, Tiner sent an email to Gilinsky putting her in touch with Jody McKibben, to whom the email was copied, informing her that he would like for her to speak with McKibben, in his capacity as "Regional VP for MS, AL, LA, TN." (Doc. No. 19-6.) In the email, Tiner stated:

> I discussed bringing you on with Jody last week and he is on board as well. Since you will be an employee with M&M, he can speak to the benefits, paperwork and other protocol that will need to be processed. You will work with me and my team specifically but be under the M&M umbrella, per se. I would also like for the two of you to speak via the phone and in person when you return in mid-December. I am flexible on timing and an official start date. It might make sense to look at the first week of January start date due to the holidays, travel, etc.

(Doc. No. 19-6.)

Sometime after this email, Gilinsky and McKibben spoke by telephone. The conversation was "pretty brief," but Gilinsky and McKibben exchanged information about their respective backgrounds, and Gilinsky was "completely honest about everything," including her desire to wait five years before getting her real estate license, her melanoma, being in remission, and her need for benefits in order to "stay on top of everything." (Gilinsky Dep. 49.) McKibben expressed to her that he was "glad to have [her] on board," because Tiner "need[ed] somebody like [her]," and he "look[ed] forward to seeing [her] sometime in December." (Gilinsky Dep. 50.) McKibben's first impression of Gilinsky was that he "liked her." (McKibben Dep. 63.) When he finally met her in person in early January, he was also favorably impressed. (*See* McKibben Dep. 64 ("I liked her. I thought she would be good.").)

After some additional email exchanges with Tiner, Gilinsky understood that her official start date would be sometime after the holidays, but she never asked for or received a formal written job offer outlining the terms of the offer or the benefits that would accrue to the position. (Gilinsky Dep. 51.)

On December 5, 2017, Gilinsky emailed Tiner to let him know she expected to arrive in

Nashville on December 20, 2017. (Doc. No. 19-7.) In the same email, she reminded him that she had not "heard from anyone about the medical benefits" and reiterated how important it was to her to "find out what kind of insurance it is, waiting period, etc." as her doctors in Oregon had "lined up doctors for [her] at Vanderbilt," but she could not set up appointments until she knew whether the doctors were within network and whether she would need to select an interim plan if there was a waiting period before her insurance through M&M started. (Doc. No. 19-7.) Tiner responded by forwarding her an email from M&M's Benefits Administrator, which provided basic benefit information, including the existence of medical, dental, and vision insurance with a thirty-day waiting period. (Gilinsky Dep. 55; Doc. No. 19-8.) The email did not include information about specific health plans, co-pays, deductibles, or in-network providers.

### D. Behind the Scenes at M&M

Meanwhile, around the time that Gilinsky responded to the Craigslist ad, Tiner's team consisted of roughly five agents or associates and one analyst. Georgia Krewson was a senior associate on Tiner's team and worked as Tiner's partner on deals. Tiner was known to be a "rainmaker" when he was performing well, and he had a strong past record with M&M, for the years 2014, 2015, and 2016. (McKibben Dep. 45.) Tiner's performance, however, dropped off substantially between 2016 and 2017 and continued to decline in 2018, until his untimely death in May or June of 2018. (McKibben Dep. 39–40.)

Sometime toward the end of 2017, Tiner approached McKibben and told him that he and Krewson were going to split their partnership up and that at least one of the analysts on the joint team would go with Krewson. Tiner spoke with McKibben about his wanting to bring a marketing coordinator onto his team. (McKibben Dep. 47.) McKibben was in favor of this idea. (*See* McKibben Dep. at 50 ("I was for it. If that's what he thought he needed to get his team back up and running, I would support that.").) According to McKibben, however, he never actually gave

Tiner permission to hire anyone. As McKibben explained, after he agreed in principle with the suggestion of bringing in a new hire, "from there, you've got to find the right person, and then it's got to be approved by the firm. So we never got to the approval process, I guess is what I'm saying." (McKibben Dep. 50.)

Asked whether this potential new hire would be an employee of M&M, McKibben indicated that he and Tiner had discussed three different possibilities: (1) if the individual was hired as an M&M employee, then the hire would have to go through the company's human resources department, and a background check would be performed; (2) if the person was engaged as an independent contractor, rather than an actual employee, then the person would be a broker, and McKibben "could do that regionally, and . . . get that done"; and (3) the firm at the time had a Student Intern Program ("SIP"), where an individual would be hired as an employee of the firm for a twelve-month term, with half of her salary paid by the firm and half paid by the agent with whom she worked, and, at the end of the twelve months, "they roll off and become an agent" and independent contractor. (McKibben Dep. 51–53.) Agents, who are employed as independent contractors, did not have to meet any educational requirements, but they did need a real estate license. And individuals hired through the SIP needed both a college degree and a real estate license. (McKibben Dep. 53–54.)

After McKibben's initial conversation with Tiner about hiring a marketing coordinator, Tiner told McKibben in late 2017 that he had met Gilinsky and wanted McKibben to talk to her. (McKibben Dep. 56.) Tiner told McKibben that he "thought she might be a good addition to the team," and he "wanted to bring her on" in a "marketing coordinator role." (McKibben Dep. 57.) According to McKibben, Tiner, in order to do so, would have had to "fund the position": "So the next step would be, he would basically submit an application that he wanted to bring her on. He'd

have to have a form of payment on file with the firm. And then we'd get the process started." (McKibben Dep. 57.) They never got to that step, however, because, in talking through the prospect with Tiner, McKibben discovered that Tiner was "worse off than [he] thought and didn't have the financial means to do what he wanted to do." (McKibben Dep. 58.) McKibben came to that conclusion "towards the end of the year," meaning the end of 2017. (McKibben Dep. 58.)

They continued to consider available options for bringing Gilinsky on. In the past, M&M had provided Tiner a "support package." (McKibben Dep. 58.) A "support package" is "a way for the firm to support an agent's business by subsidizing some of [the agent's] expenses," which it regularly did for "top-performing agents." (McKibben Dep. 58.) Tiner's team, for example, received a contribution of $40,000 from M&M toward the salary of the analyst on his team in 2017, and any additional payments to the analyst were paid by the team. In an email that McKibben sent to Bryn Merrey, his division manager, on December 6, 2017, McKibben notified Merrey that Tiner's team had "evolved into two three-person teams" and that the analyst who had been working on the team was going to be supporting Krewson's team going forward. Tiner, according to McKibben, was requesting that he be allowed to hire a "licensed assistant to support his team." (Doc. No. 19-17; *see also* McKibben Dep. 94–95.) According to McKibben, Tiner was specifically requesting that M&M contribute $20,000 towards the salary, and McKibben recommended to Merrey, at that time, that each of the two teams (Tiner's and Krewson's) be provided $20,000, contingent upon each team's generating "$1mm in gross fees for each calendar year starting in 2018." (McKibben Dep. Ex. 7, Doc. No. 19-17.) Any additional payments to the new hire and the current analyst "would be the responsibility of the respective teams." (*Id.*)

Under this proposal, if Tiner brought in a marketing coordinator, M&M would have contributed "some of the salary, and [Tiner] would contribute some of the salary." (McKibben

Dep. 59.) Ultimately, either this proposal was not actually offered to Tiner and Krewson (*see* McKibben Dep. 95 ("Q. Okay. And when was the decision made to not offer a support package? A. I'm not sure exactly . . . . It would have been sometime in . . . December or January . . . .")), or they declined it (*see* McKibben Dep. 98–99 ("I don't remember [Merrey's] exact response [to the proposal]. I think . . . [Krewson] kind of started backpedaling and . . . then so did Wes . . . in regards to having to contribute as well.")). In his Declaration, McKibben states that he informed Tiner in either late 2017 or early 2018 that, "as an independent contractor Tiner was welcome to hire his own support staff, but M&M would not contribute towards the costs of that support position in 2018." (Doc. No. 19-21 ¶ 15.) McKibben believes that Krewson and Tiner then made an effort to reconcile their team, and the company "offered them a support package that would have paid for the marketing coordinator, contingent on them returning to the gross production levels of 2016, but they were unable to reconcile and the offer was never accepted." (Doc. No. 19-21 ¶ 15.) McKibben also testified that it was while they were talking through the process and looking at various options that, as McKibben phrased it: "I kind of learned that [Tiner] was worse off than I thought he was and didn't have the financial means to do what he had originally wanted to do, I guess." (McKibben Dep. 57–58.)

The plaintiff does not dispute that M&M was "fine with Tiner hiring a marketing coordinator, but he needed to fund that position himself." (Doc. No. 23, Pl.'s Resp. to Statement of Undisp. Fact ¶ 111.) She disputes M&M's statement that Tiner was unwilling or unable to pay Gilinsky's salary himself, based on McKibben's testimony that Tiner "could pay 100 percent 'out of pocket if he chose to' because 'it's part of his business expenses.'" (*Id.* (quoting McKibben Dep. 60–61).) McKibben's testimony, however, does not suggest that Tiner would have been able to afford to pay that expense out of his business expenses; instead, McKibben simply agreed that

Tiner would have been permitted to hire Gilinsky if he had been both willing and able to pay her salary out of his business expenses. The colloquy went as follows:

> Q.  Okay. Did anybody ultimately tell Mr. Tiner that he was not able to bring on a marketing coordinator?
>
> A.  No. It was more a function of he couldn't afford to pay for it. So he couldn't— you know, that was the only way it was going to get done.
>
> Q.  So it was a situation to where if his financial circumstances improved, then he could possibly bring someone on in a marketing coordinator role?
>
> A.  Yeah. I mean, we could—then we would have taken it to the next step for sure.
>
> Q. And was he able to pay the salary—was he able to pay that 100 percent out of pocket if he chose to?
>
> A.  I'm sorry? How do you mean?
>
> Q.  Well, you're referring to his financial situation. I mean, does it come out of his— of the money he brings in? Or is this money that he's paying out of his pocket for a marketing coordinator?
>
> A.  It's part of his business expenses, yeah.

(McKibben Dep. 60–61.)

When it eventually became clear, to McKibben at least, that M&M would not help Tiner fund a new hire and that Tiner was unable or unwilling to do it himself, M&M explored other options for trying to bring the plaintiff on, including as an agent. Agents for M&M, however, are hired as independent contractors, and the plaintiff had clearly communicated to both Tiner and McKibben that she was not ready for this role, as she wanted to wait until five years after her cancer diagnosis to obtain her real estate license, and she needed a position with benefits, specifically including health care insurance. (McKibben Dep. 121–22; Gilinsky Dep. 41, 49.) McKibben also considered the possibility of bringing Gilinsky on through the SIP, but, although they discussed it, he never formally offered her this option. (McKibben Dep. 79.) In any event, the plaintiff was not interested in the position, because it would also have required her to have a real

estate license. (Gilinsky Dep. 93–94.)

### E.     The Job Offer Falls Through

When the plaintiff left Oregon for Nashville in early January 2018, she did not have a written job offer or a start date. She texted Tiner on January 1, 2018 to let him know she was on the road and emailed him on January 2 to let him know that she had arrived in Nashville. Tiner and Gilinsky did not actually talk on the phone until January 6, 2018. At that time, Tiner told her only that they were "having an issue getting [her] benefits," and things were delayed. (Gilinsky Dep. 65, 75.)

On January 8, 2018, Tiner forwarded Gilinsky an email that showed a "typical eblast" his team sent out "on recent listings." (Gilinsky Dep. Ex. 13, Doc. No. 24-1, at 49.) Tiner also emailed her marketing materials for a hotel project in Mississippi that he was working on, as he wanted Gilinsky to "start getting familiar with what he was doing." (Gilinsky Dep. 80.) He also asked Gilinsky to Google his "standings," which amounts to Googling "commercial real estate Nashville" or "commercial real estate agents Nashville" and reviewing the search results to get an idea of how an agent and his or her competitors stand out. (Gilinsky Dep. 80–81.) The same day, Tiner forwarded Gilinsky a link to enable her to register for a January 11, 2018 webinar hosted by M&M, entitled "What Tax Reform Means for Real Estate Investors," that he thought would be beneficial for her. (Gilinsky Dep. 83–84 & Ex. 14, Doc. No. 24-1, at 52–54.) In registering for the webinar, Gilinsky was asked to enter her job title and company. She texted Tiner to ask what she should put, and he responded with "Brokerage Assistant" and M&M. She attended the one-hour webinar on January 11, 2018.

On January 12, 2018, Gilinsky texted Tiner to discuss the webinar and to ask if he had an update on the paperwork and her start date. Tiner responded by apologizing for the delay and letting her know that he "ha[d] not heard back yet" but was planning to get with McKibben the

following Monday, presumably January 15, 2018, to discuss her start date and benefits. (Gilinsky Dep. 85.) On January 17, 2018, Tiner texted Gilinsky to let her know he had been "waiting on Jody [McKibben] and Bryn [Merrey]" and that they had a call scheduled for that afternoon. (Doc. No. 24-1, at 55.) Later that afternoon, Tiner texted Gilinsky again, asking if she had gotten in touch with McKibben. She responded that they were meeting the next morning. (Doc. No. 24-1, at 56.) In advance of that meeting, Gilinsky emailed McKibben a copy of her resume.

Gilinsky and McKibben met on January 18, 2018 for approximately forty-five minutes to an hour. McKibben recalled that the plaintiff brought up her cancer diagnosis and need for health benefits during their in-person meeting but did not go into detail. (McKibben Dep. 91–92.) He testified at his deposition that he was "pretty sure" that he and Merrey, by that point, had already decided that the company could not offer a support package for Tiner or Krewson, but he went ahead and met with Gilinsky because, if Tiner still "wanted to move forward with" bringing her on, then he would be supportive of that effort. (McKibben Dep. 108.)

The plaintiff disputes McKibben's statement that the purpose of the meeting was to be supportive of Tiner's desire to bring Gilinsky onto his team, pointing to M&M's EEOC position statement, prepared by McKibben (McKibben Dep. 70), which stated:

> [B]y December 5, 2017, Mr. Tiner concluded he did not have the budget to support what would be Ms. Gilinsky's wages or anyone else's wages on his own payroll. In or around December 2017, Mr. Tiner again asked Marcus & Millichap to reconsider hiring someone to support Mr. Tiner. Marcus & Millichap's Nashville office was still unable to do so, and doing so would have made no legitimate business sense, being that Mr. Tiner's business had slowed to a point where he himself was unable to support additional staff.

(McKibben Dep. 73–74 (quoting EEOC statement).) As the plaintiff points out, McKibben testified that this statement was accurate. (McKibben Dep. 74.) Thus, in other words, McKibben already knew before January 18, 2018 that Tiner could not afford to bring a new employee onto his team. McKibben also clarified, however, that there were ongoing discussions about whether

and to what extent the company could provide a support package for Tiner and Krewson and whether they would continue as separate teams or try to reconcile. (McKibben Dep. 74–75.)

Also around this time, Tiner asked Gilinsky to meet with Georgia Krewson, purportedly to make sure that she was "on board with everything." (Gilinsky Dep. 76.) McKibben testified that he understood that Tiner wanted Gilinsky to meet Krewson because, he believed, "Wes [Tiner] and Georgia [Krewson] tried to kind of reconnect to start working together again. And so that would be a situation where, you know, I [sic] would be introducing her to Georgia . . . as a potential team member."[5] (McKibben Dep. 110.) Gilinsky and Krewson met in M&M's offices sometime in late January. It felt like a "get to know you" meeting, in which Gilinsky talked about her background and experience. (Gilinsky Dep. 77.) Gilinsky recalled that Krewson "mentioned something like, Wes [Tiner] is bringing you on board, and you're going to be working with our team." (Gilinsky Dep. 78.)

On or around January 23, 2018, Gilinsky again reached out to Tiner by text, asking for an update on her start date and letting him know that, if she did not get a firm start date soon, she would have to look elsewhere for employment. (Gilinsky Dep. 91–92; Doc. No. 24-1, at 57.) She also explained that she had been placed in a difficult situation with respect to her health insurance and financial situation. (Doc. No. 24-1, at 57.)[6] Tiner responded the same day, noting that he had had a telephone call with Krewson and McKibben that afternoon and asking to speak with Gilinsky

---

[5] It is unclear whether the "I" in this line of the deposition is a transcription error. Gilinsky testified that it was Tiner who wanted her to meet with Krewson. (Gilinsky Dep. 77.) McKibben was aware, at least after the fact, that Gilinsky and Krewson had met, based on a text exchange with Gilinsky asking how her meeting with Krewson had gone. (McKibben Dep. 110.) But the parties have not pointed to any other evidence in the record suggesting that McKibben instigated that meeting or had anything to do with it.

[6] The content of the message also indicates that it predates the plaintiff's meeting with Krewson, as she states, "I have not been able to speak with Georgia yet, we've been playing phone tag." (Doc. No. 24-1, at 57.)

the following day. He also told Gilinsky that he thought they could "shoot" for a start date in the middle of the following week and that McKibben was going to "get the paperwork in process." (Doc. No. 24-1, at 57.)

The next day, January 24, Tiner sent Gilinsky a document for her to review. The document was M&M's SIP Agreement. Gilinsky did not want to sign this document and reached out to Tiner to discuss it. They met for lunch on January 28, 2018 to discuss the Agreement and the plaintiff's concerns with it. During lunch, Tiner indicated that he "totally understood" why she was not happy with the Agreement and expressed his own frustration with it. (Gilinsky Dep. 96.) He told her to simply make any changes on the document she needed and that he would take the Agreement to McKibben and they would "come to an agreement." (Gilinsky Dep. 96.) One of the specific items with which she disagreed was that the Agreement would have required her to become an agent within a year. Gilinsky reiterated to Tiner that she did not want to be an agent within that time frame. He told her to mark up the document, which she did while they were at lunch, noting her disagreement with many aspects of the Agreement. She gave the marked up document to Tiner but never saw it again. (Gilinsky Dep. 96.) Tiner indicated that he agreed with her changes, and he told Gilinsky that her edits were what "they" needed to "get things moving." (Gilinsky Dep. 102.) He also assured Gilinsky that he would get "all the changes" "pushed through" and "get her to work" the following Tuesday. (Gilinsky Dep. 101, 107.)

The lunch lasted approximately three hours, and Gilinsky described it as "awkward," "weird," and "almost inappropriate" due to the amount of personal information Tiner shared, including about his divorce and his son in rehab. (Gilinsky Dep. 100.) She had a "gut feeling" that something was just "weird." (Gilinsky Dep. 101.)

That evening, Tiner sent Gilinsky a text message asking her to lay out her one-year, three-

year, and five-year goals. Gilinsky interpreted the message as an indication that, because he was going to "make an investment in [her] as an employee," he "want[ed] to know kind of where [her] head [was] at, you know, . . . what's [her] plan." (Gilinsky Dep. 108.) She understood it as further affirmation that he wanted and intended to bring her on board; it did not strike her as "a text of someone who is looking for a reason not to hire [her]." (Gilinsky Dep. 109.)

Gilinsky did not start working for M&M the following week and, in fact, did not hear from Tiner or McKibben Monday or Tuesday. She either called or texted Tiner to follow up when she had not heard anything. (Gilinsky Dep. 107.)

McKibben texted Gilinsky on February 8, 2018 to ask about Gilinsky's meeting with Krewson and her progress with real estate school. He also confirmed that, if she signed the SIP Agreement she would be a "company employee [with] the full benefits package." (Gilinsky Dep. 110–11.) It is not entirely clear what prompted that communication. Gilinsky testified that it was prompted by their wanting her to sign the SIP Agreement but not with the changes she had made to it. (Gilinsky Dep. 110.) She believed that she had a telephone call with McKibben at some point after her meeting with Tiner, at which McKibben "basically stated" that he "needed to keep the document as is." (Gilinsky Dep. 106.)

The plaintiff responded to McKibben's text, verifying that she had met with Krewson and that she was about "60 percent of the way through with real estate school." (Gilinsky Dep. 111.) She also "outlined" that she had been given multiple start dates since the beginning of January and needed to be "100 percent certain this time around when given a start date that it's going to happen." (Gilinsky Dep. 111.) At some point, they discussed matters further by telephone, and Gilinsky told McKibben again that she had "never agreed to come over here to do [her] real estate license, to . . . be an agent." (Gilinsky Dep. 112.) McKibben told her that she would be a "really

great agent" and that M&M had a "great training program." (Gilinsky Dep. 113.) By that point Gilinsky was "frustrated," because she had been "clear from day one" that that was not what she was looking for and that, given her situation, it was not something she could do at that moment. (Gilinsky Dep. 113.) McKibben understood but added, "we'd still . . . like to have you within this company," and she would "be a great asset" to the firm when she was "ready to be an agent." (Gilinsky Dep. 113, 114.)

Her last communication with McKibben happened shortly thereafter, when Gilinsky left a voice message for McKibben, and he responded with a text on February 9, 2018, asking if she had time the next morning for a telephone call. Gilinsky indicated that she would be available. The next morning, McKibben texted her again saying: "I'm talking to [Tiner] later today about one other possibility to bring you on directly as marketing coordinator—one of us will reach out before the weekend is over." (Doc. No. 19-19, at 4.) Gilinsky never heard from Tiner or McKibben again after that. (Gilinsky Dep. 114.)

However, on February 15, 2018, she sent Tiner an email expressing her "disappointment with how everything had shaken out" and "officially cut[ting] the tie." (Gilinsky Dep. 114–15.) She stated: "[D]uring these last 45 days, I turned down other legitimate opportunities to work and provide for myself because I was assured by you and [McKibben] that I did not need to look for another job." (Gilinsky Dep. 118.) She also asked for $3,500 in compensation for the work she had done for Tiner, including attending the webinar, reviewing his marketing, and doing web research. (Gilinsky Dep. 116, 118.) She estimated that this would be "the amount of a one-way ticket back to Oregon" and "one month's salary." (Gilinsky Dep. 118.) She never received a response.

She did not learn until sometime during the course of litigation that Tiner had passed away

from a drug overdose several months later. She was shocked and would never have known that he had any kind of drug or alcohol problem. (Gilinsky Dep. 117–18.)

Gilinsky began working for Meredith Corporation, the NBC affiliate in Nashville, in July 2018. She stayed with Meredith through April 2020, when she moved to Sarasota, Florida to work at Gray Communications, performing sales and marketing.

Gilinsky testified that she sought an accommodation for her disability—cancer—by asking Tiner and McKibben for flexibility in scheduling doctors' appointments and taking time off as needed for appointments and surgeries. (Gilinsky Dep. 89). When she discussed the accommodation she would need, both Tiner and McKibben told her it would be no problem for her to take the time she needed. (Gilinsky Dep. 89.) Regarding her need for health insurance coverage, Gilinsky "felt like" Tiner and McKibben were "giving [her] the run-around." (Gilinsky Dep. 86.) She felt like M&M was "not wanting to give [her] benefits" because they saw her as a "liability" and that the "benefits were the hold-up." (Gilinsky Dep. 86.) No one ever told her they saw her as a liability, and, before she was offered a job, she was clear about her need for health insurance benefits. (Gilinsky Dep. 96.) She did not know how large a company M&M is, but she guessed that it was a "decent-sized company" with "a lot of locations around the country." (Gilinsky Dep. 87.) No one ever discussed with her how much it might cost M&M to add her to its health insurance plan, and she had no idea how much a single person's health situation might impact a health insurance plan such as the one M&M carried. (Gilinsky Dep. 87–88.)

At the time Gilinsky sought employment with M&M, no other team was looking to hire anyone in the type of position that she was looking for. (McKibben Dep. 83.) Nearly everyone M&M "hires" comes on as an independent contractor. (McKibben Dep. 83.) Moreover, at that time, M&M had never hired a marketing coordinator for McKibben's region, and he was not

looking for any such person. (McKibben Dep. 84.) Sometime in the summer of 2018, M&M hired a regional marketing coordinator. (McKibben Dep. 84.) McKibben testified that, at the time of his deposition, M&M had a marketing coordinator overseen by McKibben who "handle[d] the marketing for his region and the Carolinas." (McKibben Dep. 20.) In addition, there were "probably three" teams (out of twelve) that had marketing coordinators who were responsible for marketing for a particular team. (McKibben Dep. 21.) The company refers to those individuals as sales office assistants, though the agents with whom they work might call them marketing coordinators. (McKibben Dep. 20–21.)

McKibben testified that the marketing coordinators working with individual teams are frequently independent contractors rather than employees, but, if they are hired as employees, they are employed by M&M, not by an individual broker. (McKibben Dep. 25–26.)

## II.    PROCEDURAL BACKGROUND

Gilinsky filed suit against M&M on March 27, 2020, articulating claims under the ADA, 42 U.S.C. § 12101, *et seq.*, for disability discrimination, retaliation, failure to engage in the interactive process, and failure to accommodate. (Doc. No. 1, at 8 ("Count I").) In addition, she asserts a claim under Tenn. Code Ann. § 50-1-102(a)(1), based on M&M's allegedly luring her to move to Tennessee for employment under false pretenses.

On April 30, 2021, defendant M&M filed its Motion for Summary Judgment, supporting Memorandum of Law (Doc. No. 17), Statement of Undisputed Material Facts (Doc. No. 18), and various evidentiary materials, including the complete transcripts of the plaintiff's and Jody McKibben's depositions (Doc. No. 19 and exhibits thereto), addressing and seeking dismissal of each of the claims identified in the Complaint. The plaintiff filed a Response to the motion (Doc. No. 27), Response to the Statement of Undisputed Material Facts (Doc. No. 23), her own exhibits (Doc. Nos. 24-1, 24-2), which are largely duplicative of those filed by the defendant, and a

"Statement of Additional Material Facts" (Doc. No. 24). The defendant filed a Response to the latter but, at the same time, objected that the plaintiff's filing is in derogation of Local Rule 56.01 and should be stricken or, in any event, should not be considered by the court. The defendant also filed a Reply. (Doc. No. 28.)

## III.   STANDARD OF REVIEW

### A.   Rule 56

Summary judgment is appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "By its very terms, this standard provides that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). In other words, even if genuine, a factual dispute that is irrelevant or unnecessary under applicable law is of no value in defeating a motion for summary judgment. On the other hand, "summary judgment will not lie if the dispute about a material fact is 'genuine.'" *Id.*

"[A] fact is 'material' within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law." *O'Donnell v. City of Cleveland*, 838 F.3d 718, 725 (6th Cir. 2016) (citing *Anderson*, 477 U.S. at 248). A dispute is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Peeples v. City of Detroit*, 891 F.3d 622, 630 (6th Cir. 2018).

The party bringing the summary judgment motion has the initial burden of identifying portions of the record—including, *inter alia*, depositions, documents, affidavits, or declarations— that it believes demonstrate the absence of a genuine dispute over material facts. *Pittman v. Experian Info. Sols., Inc.*, 901 F.3d 619, 627–28 (6th Cir. 2018); Fed. R. Civ. P. 56(c)(1)(A). The non-moving party must set forth specific facts showing that there is a genuine issue for trial.

*Pittman*, 901 F.3d at 628. The court must view the facts and draw all reasonable inferences in favor of the non-moving party. *Id.* Credibility judgments and weighing of evidence are improper. *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018).

In its Reply, M&M contends that the plaintiff's failure to respond to its arguments seeking judgment on the plaintiff's ADA claims for retaliation, failure to accommodate, and failure to engage in the interactive process effectively "concedes these claims." (Doc. No. 28, at 2 (citing *Brown v. VHS of Mich., Inc.*, 545 F. App'x 368, 372 (6th Cir. 2013)).) Indeed, the Sixth Circuit has repeatedly stated that "a plaintiff is deemed to have abandoned a claim when a plaintiff fails to address it in response to a motion for summary judgment." *Brown*, 545 F. App'x at 372 (citing *Hicks v. Concorde Career Coll.*, 449 F. App'x 484, 487 (6th Cir. 2011); *Clark v. City of Dublin*, 178 F. App'x 522, 524–25 (6th Cir. 2006); *Conner v. Hardee's Food Sys.*, 65 F. App'x 19, 24–25 (6th Cir. 2003)). At the same time, however, in reported opinions, the Sixth Circuit has made it clear that a district court faced with a plaintiff's failure to respond, in whole or in part, to a motion for summary judgment "[may] not use that [failure] as a reason for granting summary judgment without first examining all the materials properly before it under Rule 56(c)." *F.T.C. v. E.M.A. Nationwide, Inc.*, 767 F.3d 611, 630 (6th Cir. 2014) (quoting *Smith v. Hudson*, 600 F.2d 60, 65 (6th Cir. 1979)). The district court retains this obligation, because "[a] party is never required to respond to a motion for summary judgment in order to prevail since the burden of establishing the nonexistence of a material factual dispute always rests with the movant." *Id.* (quoting *Smith*, 600 F.2d at 64). Consequently, despite the plaintiff's silence in response to the defendant's arguments, the court "must review carefully the portions of the record submitted by the moving party to determine whether a genuine dispute of material fact exists" before granting summary judgment on those particular claims. *Id.*

**B.     Local Rule 56.01**

Local Rule 56.01(c)(3) permits the party responding to a motion for summary judgment to include, with the party's response to the moving party's statement of undisputed material facts, "a concise statement of any additional facts that the non-movant contends are material and as to which the non-movant contends there exists a genuine issue to be tried." The plaintiff has submitted a Statement of Additional Material Facts, but her Statement is not in compliance with that rule, as it is not concise, and it does not simply contain "additional" facts that the plaintiff believes to be material or disputed. Instead, it consists of 130 separate "facts," many of which are immaterial background facts, and many others of which reiterate undisputed facts already set forth in the defendant's Statement of Undisputed Material Facts. (*Compare, e.g.*, Doc. No. 24 ¶¶ 15–20, 23–24, *with* Doc. No. 18 ¶¶ 44–55.)

The entire objective of Local Rule 56.01(c)(3) is to provide the non-moving party an opportunity to demonstrate the existence of *additional* material facts that are disputed or that the moving party has overlooked and that the non-moving party believes preclude summary judgment. It is not intended to provide an opportunity simply to reiterate all of the facts in the record, which is what the plaintiff has done here. Because the plaintiff's Statement of Additional Material Facts is neither concise nor helpful, the court will exercise its discretion to disregard the document in its entirety.[7] The court has nonetheless reviewed all of the evidentiary material in the record submitted

---

[7] The court will not go so far as to strike the document, as requested by the defendant in its Reply. Even if M&M had filed an actual motion to strike, district courts "generally look with disfavor" on such motions, *Bell v. Providence Cmty. Corrs., Inc.*, No. 3:11-cv-0203, 2011 WL 2218600, at *7 (M.D. Tenn. June 7, 2011), largely because the specific authority to strike documents is found in Rule 12(f), which permits such action only with respect to "a pleading" that contains "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Although the court possesses inherent authority to control its own docket, which encompasses the power to strike filings or parts thereof as appropriate, *accord In re*

by both parties.

## IV. DISCUSSION

### A. ADA Discrimination Claim

#### 1. Legal Standard

The ADA states, "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Ultimately, to prove ADA employment discrimination, a plaintiff must prove that she is disabled and suffered an adverse employment action because of her disability. *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016), *abrogated on other grounds by Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308 (6th Cir. 2019). The Sixth Circuit has held that the "because of" language in the ADA sets a "but for" causation standard. *Lewis v. Humboldt Acquisition Corp.*, 681 F.3d 312, 318 (6th Cir. 2012) (en banc) (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 177–78 (2009)).

In the absence of direct evidence of discrimination, a plaintiff may avoid summary judgment on her ADA discrimination claim by "point[ing] to circumstantial evidence of discrimination under the well-trod *McDonnell Douglas* burden-shifting framework." *Babb*, 942 F.3d at 319 (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Under this standard, the plaintiff must first establish a *prima facie* case of discrimination by showing that:

> (1) he or she is disabled, (2) he or she is otherwise qualified for the position, with or without reasonable accommodation, (3) he or she suffered an adverse employment action, (4) the employer knew or had reason to know of the plaintiff's disability, and (5) the position remained open while the employer sought other

*Caterpillar Inc.*, No. 3:19-MC-0031, 2020 WL 1923227, at *7 (M.D. Tenn. Apr. 21, 2020), the court does not find it necessary to take such a drastic step in this instance.

applicants or the disabled individual was replaced.

*Ferrari*, 826 F.3d at 891. If the plaintiff meets this "not onerous" requirement, *id.* at 894 (quotation omitted), the employer must then offer a "legitimate explanation for its action," which is also rarely an onerous requirement, *id.* at 892 (quotation omitted). After the employer does that, "the burden then shifts back to the [employee], who must introduce evidence showing that the [employer's] proffered explanation is pretextual." *Id.* (quotation omitted).

### 2. The Plaintiff Cannot Establish a Prima Facie Case

For purposes of summary judgment, M&M does not dispute that the plaintiff can show the first, second, and fourth elements of a *prima facie* case: that she is disabled; that she was qualified for the position in question; and that the employer knew of her disability.[8] It argues however, that the plaintiff cannot establish the third and fifth elements.

Regarding the third element, however, there is no dispute that Gilinsky ultimately was not hired for the brokerage assistant job that Tiner had offered to her. In attempting to avoid the conclusion that the plaintiff has met the third element of her *prima facie* case, the defendant incorrectly imports into this element a requirement that the plaintiff establish a "but-for" causal connection between her disability and the adverse action. It is true, as set forth above, that, to prevail, a plaintiff must ultimately prove that she suffered discrimination because of her disability. However, proof of such a causal connection is not part of the *prima facie* case. Instead, if a plaintiff is able to establish the five elements of a *prima facie* case as articulated above, then an inference of discrimination—and of a causal connection—arises. The defendant may then rebut the inference

---

[8] The ADA defines disability to mean "(A) a physical or mental impairment that substantially limits one or more major life activities . . . ; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ." 42 U.S.C. § 12102(1) (formatting omitted). The parties do not address this definition or explain how the plaintiff meets it.

of discrimination by showing that it had a legitimate, non-discriminatory reason for its actions. The court finds, in short, that there is no dispute, for purposes of the defendant's Motion for Summary Judgment, that the plaintiff suffered an adverse employment action when she was denied employment at M&M and, therefore, has established the third element of her *prima facie* case of discrimination.

The defendant also argues that the plaintiff cannot establish the fifth element of her *prima facie* case. To establish this element, "the plaintiff must show that, after she was rejected, the employer either (1) filled the position with someone outside of the plaintiff's protected class . . . or (2) kept the position open and continued to seek other applicants." *George v. Youngstown State Univ.*, 966 F.3d 446, 470 (6th Cir. 2020) (citations omitted). The defendant asserts that the plaintiff cannot show either that the position was filled or that it remained open. The plaintiff argues, in response, that there is a material factual dispute as to whether the position remained open while the firm looked for other candidates, pointing to McKibben's testimony that, as she claims, "other marketing coordinators have been hired to serve specific teams" and that he later hired a marketing coordinator, overseen by him, to support the entire region. (Doc. No. 27, at 16–17.)

The plaintiff's argument is unavailing. While McKibben testified that the firm as a whole hired a marketing coordinator for his entire region plus the Carolinas in the summer of 2018, there is no evidence that this position was open or even being considered at the time the plaintiff's job offer fell through in January or February 2018. Even if the regional marketing position had been open at that time, it is not the position that she was offered by Tiner. Regarding the other marketing coordinators employed to serve other specific teams at M&M, Gilinsky offers no evidence regarding when these individuals were hired or whether they were hired as employees instead of independent contractors. Specifically, there is no indication in the record that any team was

actively looking to employ, in a W-2 position, a marketing coordinator or brokerage sales assistant around the time that Tiner was trying to hire Gilinsky.

Regarding the brokerage sales assistant position that was actually offered to Gilinsky by Tiner, there is no evidence that this position remained open after Gilinsky was ultimately not hired to fill it, that Tiner or anyone on his team—or at M&M generally—continued to look for candidates, that any person was hired to fill it, or that Tiner or his team would have been financially able to contribute toward the salary of anyone to fill the position for which Gilinsky was recruited. The plaintiff offers no evidence that anyone else was interviewed for the position, and McKibben affirmatively avers that no one was interviewed for the position other than the plaintiff. (Doc. No. 19-2 ¶ 18.) Further, according to McKibben, after the attempts to bring Gilinsky on with M&M failed, the already existing members of Tiner's team either spread the marketing duties among themselves or "made do without." (*Id.* ¶ 20.) This approach continued until Tiner's untimely passing in June 2018, at which point his team dissolved. (*Id.* ¶ 21.) The fact that the job duties were spread out among existing employees serves as evidence that the position was not kept open and that M&M did not continue to seek other applicants. *Accord George*, 966 F.3d at 470 (noting that the plaintiff could satisfy this element of his *prima facie* case with evidence that, after he was not hired, the position was kept open while the employer continued to seek other applicants). The plaintiff points to no evidence to the contrary.

In sum, the plaintiff offers no evidence to support the fifth element of her *prima facie* case of discrimination. The defendant, therefore, is entitled to summary judgment on the ADA failure-to-hire claim.

### B.    Failure to Accommodate and Failure to Engage in the Interactive Process

"[A]n employer's failure to grant a reasonable accommodation to a disabled employee falls under the ADA's definition of discrimination." *Tchankpa v. Ascena Retail Grp., Inc.*, 951 F.3d

805, 811 (6th Cir. 2020) (citing *Kleiber v. Honda of Am. Mfg., Inc.*, 485 F.3d 862, 868 (6th Cir. 2007)). In *Kleiber*, the Sixth Circuit made it clear that claims of failure to accommodate must rest on direct, rather than indirect, evidence. *See Kleiber*, 485 F.3d at 868 ("[C]laims premised upon an employer's failure to offer a reasonable accommodation necessarily involve direct evidence . . . of discrimination."); *see also Brumley v. United Parcel Serv., Inc.*, 909 F.3d 834, 839 (6th Cir. 2018) (because ADA failure to accommodate claims "necessarily involve direct evidence," "the familiar *McDonnell-Douglas* burden-shifting framework . . . does not apply" (quoting *Kleiber*, 485 F.3d at 868–69).

In order to establish such a claim, the plaintiff must, among other factors, show that she proposed a reasonable accommodation and that the employer denied her proposed accommodation and failed to engage in "'an informal, interactive process' to negotiate an accommodation that [would have allowed] disabled employee to work despite [her] limitations." *Tchankpa*, 951 F.3d at 812. This test implicitly presumes that the employee bringing the claim was actually *employed*. The applicable standards simply do not fit comfortably within the framework of the facts presented in this case: a situation in which the plaintiff was, in essence, promised employment but the job never came through. Because she was never actually hired, M&M never had an opportunity to deny a reasonable accommodation for the plaintiff's disability. As the defendant argues, insofar as Gilinsky's claim is based on a contention that she was not hired *because of* her accommodation request, such a claim is properly brought as a disability discrimination claim, which fails for the reason stated above.

Even if the court were to find that a failure to accommodate claim could proceed, despite the plaintiff's never having been hired, the claim still must fail. Viewing the facts in the light most favorable to the plaintiff, the court finds that the plaintiff proposed a need for sufficient sick leave

and flexibility in her schedule to attend future doctor's appointments and to schedule possible future surgical procedures. Her request was not sufficiently specific to constitute a request for an accommodation. *See Cassidy v. Detroit Edison Co.*, 138 F. 3d 629, 631 (6th Cir. 1998) (finding a vague request for accommodation insufficient to create genuine issue of material fact). Instead, the plaintiff was essentially requesting assurance that she would be granted an accommodation, if hired, when she needed it. Moreover, even assuming, hypothetically, that such a vague request for time off in the future constituted a request for an accommodation, the plaintiff does not deny that the defendant's agents' responses to her request were consistently positive and reassuring. As a result, no need to engage in the interactive process ever arose.

Although the plaintiff did not respond to the defendant's arguments in support of dismissal of this claim, the court has "review[ed] carefully the portions of the record" submitted by M&M and finds that no genuine dispute of material fact exists. M&M is entitled to summary judgment on the plaintiff's ADA claims based on M&M's purported failure to accommodate and failure to engage in the interactive process.

### C. ADA Retaliation

In the absence of direct evidence, courts analyze an ADA retaliation claim under the *McDonnell-Douglas* burden-shifting approach. *Rorrer v. City of Stow*, 743 F.3d 1025, 1046 (6th Cir. 2014). This approach requires the plaintiff to establish a *prima facie* case of retaliation by showing that "(1) the plaintiff engaged in activity protected under the ADA; (2) the employer knew of that activity; (3) the employer took an adverse action against plaintiff; and (4) there was a causal connection between the protected activity and the adverse action." *Id.* If the plaintiff makes this showing, "the defendant has a burden of *production* to articulate a nondiscriminatory reason for its action. If the defendant meets its burden, the plaintiff must prove the given reason is pretext for retaliation." *E.E.O.C. v. Ford Motor Co.*, 782 F.3d 753, 767 (6th Cir. 2015) (internal citation

omitted).

Regarding the first element of the plaintiff's *prima facie* case, the term "protected activity" "typically refers to action taken to protest or oppose a statutorily prohibited discrimination." *Rorrer*, 743 F.3d at 1046. The Sixth Circuit recognizes an employee's request for an accommodation as "protected activity" for purposes of a retaliation claim. *A.C. ex rel. J.C. v. Shelby Cty. Bd. of Educ.*, 711 F.3d 687, 698 (6th Cir. 2013). However, as set forth above, there is no evidence in this case that the plaintiff actually requested an accommodation. She therefore cannot meet the first element of the *prima facie* case.

In addition, the plaintiff offers no evidence of the fourth element: a causal connection between the failure to hire and her request for health insurance benefits and a flexible schedule in order to attend medical appointments or undergo medical procedures. The heading for the section of the Complaint entitled "Count I" includes a reference to retaliation, but the paragraphs within this section of the Complaint do not refer to retaliation or identify any facts that support such a claim. The court finds that the record is devoid of any evidence of a causal connection between the plaintiff's protected activity and the adverse action.

Moreover, the defendant has articulated a legitimate, non-retaliatory reason for its actions. Tiner approached M&M and requested approval to hire his own marketing coordinator. M&M initially approved, but, when it came time to discuss compensation for the position, Tiner did not qualify for a support package on his own, and reconciliation with Krewson was unachievable, which prevented him from receiving any support package. The plaintiff has not attempted to show that the proffered reason is pretextual, for purposes of her retaliation claim.

The defendant is entitled to summary judgment on this claim as well.

### D.     Tenn. Code Ann. § 50-1-102

Gilinsky's Complaint also sets forth a claim under Tenn. Code Ann. § 50-1-102, which

makes it

> unlawful for any person to induce, influence, persuade or engage workers to change from one place to another in this state, or to bring workers of any class or calling into this state to work in any type of labor in this state through or by means of false or deceptive representations, false advertising or false pretenses, concerning the kind and character of the work to be done, or the amount and character of compensation to be paid for the work, or the sanitary or other conditions of the employment . . . .

Tenn. Code Ann. § 50-1-102(a)(1). Any worker damaged by a violation of that provision may bring a cause of action "for all damages that the worker has sustained in consequence of the false or deceptive representations, false advertising, and false pretenses used to induce the worker to change the worker's place of employment," plus attorney's fees and costs. *Id.* § 50-1-102(c)(1) & (2).

The Tennessee courts have had little opportunity to apply this statute. The federal district courts within the state that have addressed it, however, have concluded that it does not apply in a situation in which the plaintiff is never actually employed by the defendant. For example, in *Brewer v. United Wisconsin Insurance Co.*, 972 F. Supp. 2d 1044 (M.D. Tenn. 2013), the plaintiff argued that the defendant violated the statute when it offered her a job but revoked the offer after she left her current job. Former Judge Nixon of this court dismissed the § 50-1-102 claim, reasoning that, because the plaintiff had never actually been employed, there was no basis for evaluating whether the actual job matched the defendant's description of the position:

> In considering the motion to dismiss Plaintiff's claim under the statute, the Court must evaluate only alleged instances of false or deceptive representations, false advertising, or false pretenses. *See* Tenn. Code Ann. § 50-1-102(c)(1). The parties agree that they discussed the Loss Control Consultant job in detail . . . . However, Plaintiff does not allege that Defendant misrepresented the substance of the position in their discussions. Instead, this case arises out of Defendant's alleged failure to follow through on its offer of employment after Plaintiff disclosed her age. . . . Plaintiff was therefore unable to reasonably evaluate whether Defendant's descriptions of the Loss Control Consultant position conformed to the position's actual character as she never performed any work in the position.

*Id.* at 1048 (internal record citations omitted). The court contrasted the facts before it with those in one of the very few Tennessee opinions finding that a plaintiff was entitled to relief under the statute, *Risher v. Cherokee Buick–Pontiac–Oldsmobile–GMC Truck, LLC*, No. E2002-1644-COA-R3-CV, 2003 WL 21755055 (Tenn. Ct. App. July 28, 2003)). In *Risher*, the employee "experienced the difference between promised and actual employment over several months while working for the employer," whereas in *Brewer*, "the Plaintiff alleges termination before her employment began." *Brewer*, 972 F. Supp. 2d at 1048 (citing *Risher*, 2003 WL 21755055 at *6–7)); *accord Wright v. Wacker-Chemie AG*, No. 1:13-CV-331, 2014 WL 3810584, at *10 (E.D. Tenn. Aug. 1, 2014) ("[A]s Defendants note, '[a]ll four types of misrepresentation detailed in Tenn. Code Ann. § 50-1-102 pertain to conditions of actual employment' and do not extend to misrepresentations where work is not actually begun." (quoting *Brewer*, 972 F. Supp. 2d at 1047)).

As in *Brewer*, this case arises out of the defendant's "alleged failure to follow through on its offer of employment." *Brewer*, 972 F. Supp. 2d at 1048. Because the plaintiff was never actually employed by M&M, the court "is unable to reasonably evaluate whether Defendant's descriptions of the . . . position [offered] conformed to the position's actual character," *id.*, and Gilinsky's claim necessarily fails. The plaintiff attempts to avoid this conclusion by arguing that, unlike the plaintiffs in *Brewer* and *Wright*, she was "working," because she attended an hour-long webinar, reviewed an "e-blast" forwarded to her by Tiner, and Googled Tiner's standings. Despite Gilinsky's claim that these were "required" activities, there is no dispute that Gilinsky was never formally offered a start date or a confirmed salary or benefit terms, and her job offer was effectively rescinded before she was formally employed. The case is materially indistinguishable from *Brewer*, and the plaintiff cannot establish a cause of action under § 50-1-102. The defendant is entitled to summary judgment on this claim as well.

**V.     CONCLUSION**

For the reasons set forth herein, the court will grant the defendant's Motion for Summary

Judgment. An appropriate Order is filed herewith.

_____
ALETA A. TRAUGER
United States District Judge